THE MASONIC BUILDING ASSOCIATION OF STAMFORD, CONNECTICUT, INC. *vs.* THE TOWN OF STAMFORD, AND THREE COMPANION CASES.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued June 12th—decided July 27th, 1934.

*James E. Brinckerhoff,* with whom was *Charles R. Covert,* for the appellant (plaintiff).

*Thomas J. Ryle,* with whom was *Peter J. Ryan,* for the appellee (defendant).

MALTBIE, C. J. These are appeals by the plaintiff from the refusal of the board of relief of the town of Stamford to reduce assessments for taxation made against its property in the years 1929, 1930, 1931 and 1932. The property consists of a lot of land in Stamford upon which stands a Masonic Temple. The finding discloses the following facts: The plaintiff is a

corporation without capital stock under the laws of this State, organized and inspired by members of the Masonic fraternity in Stamford. The purpose stated in its articles of association is to erect and maintain in that town a suitable building for the use and benefit of the Masonic fraternity. With funds secured by gifts from the Blue Lodges in Stamford and members of the order and by a mortgage on its property it bought land and erected the Temple. The corporation holds all its property for the use and benefit of the Masonic fraternity in Stamford and there is an exact identity between the two. A portion of the Temple, amounting to sixty-five per cent, is devoted exclusively to Masonic purposes and from it the plaintiff derives no revenue. The remainder is occupied by an auditorium, a kitchen, bowling alleys, a billiard room and the like and from these a small income is derived.

There are three Blue Lodges in Stamford, comprising the entire Masonic fraternity there. These Blue Lodges, with others in the State, are subordinate to the Grand Lodge, which consists of representatives of the Blue Lodges. Aside from gifts, the Grand Lodge derives all its support from the Blue Lodges. In connection with it and identical in membership is the Masonic Charity Foundation, the sole object of which is to care for members of the order and the related organization of Eastern Star, their wives, widows, mothers and children, who are in need of assistance. Eight-tenths of the revenue of the Grand Lodge is contributed to the Foundation. Each Blue Lodge is compelled by the laws of the order to contribute stated sums for the support of the Grand Lodge. Aside from the charities of the Foundation, each Blue Lodge carries on such charities as are necessary and required. No contract relationship exists between any Mason and his Lodge, the Grand Lodge or the Foundation.

Masonic law forbids any distribution of the funds or property of any Lodge, the Grand Lodge or the Foundation among the members of the order, nor can any officer or member receive any part of such funds or property except as reasonable compensation for services rendered or as a proper beneficiary of their charities; and if a Blue Lodge dissolves, its property reverts to the Grand Lodge. The Blue Lodges are secret fraternal orders, to join which the applicant must pass certain tests and be voted on by the members; and rejections are not infrequent if the wrong character of man applies.

In addition to these facts, the finding describes in considerable detail the theory and practice of Masonry, but it suffices for the disposition of this case to summarize these findings. They effectually establish that Masonry, basically and ritualistically, is religious in purpose and spirit; that it is educational in the broad sense of that term; and that it is characterized by a spirit of charity and benevolence. If the statutes granting exemptions from taxation were broad enough in their terms to include the property of every organization which is educational in a broad sense, which is characterized by benevolence and charity, and which inculcates in its members a spirit of worship of and reverence for the Deity, Masonic lodges might well claim their benefit. The provisions of the statutes are, however, precise, and the question is, whether they evince a legislative intent sufficiently broad to include the property of the plaintiff. The defendant claims that, even though the property of Masonic lodges might be exempt within the meaning of the statutes, yet the plaintiff, a corporation not itself a part of the order, holding its property upon a trust not appearing of public record, should not be included, but these contentions we do not find it necessary to consider.

The origin of exemptions from taxation in this State is found in the Statute of Charitable Uses first adopted in 1684 and rephrased in 1702 to provide that lands or other hereditaments given or granted for the "ministry of the Gospel . . . , or schools of learning, or for the relief of poor people, or for any other public and charitable use," should forever remain devoted to such uses and be exempted out of the general list of the State and free from the payment of taxes. 3 Col. Rec. p. 58; Laws of 1702, p. 64. In the Revision of 1821 the provision for this exemption was dropped from this statute and seems not to have been given any place elsewhere in the statutes, an omission which was repaired in 1822 by the enactment of a statute exempting portions of buildings used as colleges, academies, schoolhouses, churches and infirmaries. Statutes of 1835, p. 528. In 1851, to this provision another was added exempting all buildings belonging to scientific, literary, benevolent or ecclesiastical societies, used exclusively for scientific, literary and benevolent purposes. Public Acts, 1851, Chap. 47, § 6. In 1871 the adjective "public" was inserted before the word "schoolhouses." Public Acts, 1871, Chap. 59. These provisions were thereafter continued in the statutes until 1925 in substantially the same terms, except that from the provision concerning buildings belonging to scientific, literary, benevolent or ecclesiastical societies certain exceptions were made, not germane to our inquiry, and a specific exemption of musical instruments used exclusively by churches and of the investments of ecclesiastical societies was added. General Statutes, Rev. 1918, §§ 1160, 1166; Public Acts, 1921, Chap. 109.

In 1925 began a series of changes in these provisions. Public Acts, 1925, Chap. 245; Public Acts, 1929, Chap. 24; Revision of 1930, §§ 1163, 1165. In 1929 and since the statutes have exempted real property owned by

and held in trust for a Connecticut corporation organized exclusively for scientific, educational, literary, historical, or charitable purposes or for two or more of such purposes and used exclusively for carrying out one or more of such purposes and the personal property owned by or held in trust for any such corporation, provided that no officer, member or employee receives or at any future time shall receive any pecuniary profit in the portions thereof so used, except reasonable compensation for services in effecting one or more of its purposes or as proper beneficiary of its strictly charitable purposes, and provided a certain statement shall be filed with the board of assessors; and the statutes also exempt personal property within the State owned by or held in trust for a Connecticut religious congregation, whether or not incorporated, if the principal or income shall be used and appropriated for religious or charitable purposes or both, and "houses of religious worship, the land on which they stand, their pews, furniture and equipment" owned by or held in trust for the use of any Connecticut religious organization; and it is further provided that if a portion only of any lot or building belonging to, or held in trust for, any such organization should be used exclusively for carrying out one or more of the purposes specified, the lot or building should be exempt only to the extent of the portion so used and the remaining portion should be subject to taxation.  General Statutes, §§ 1163, 1165. Undoubtedly, these later changes in the statutes were intended to carry further the purpose of the amendments made to earlier laws, "to correct abuses and evasions which had grown up under, and were supposed to be permitted by, the law as it then stood;" *Brunswick School* v. *Greenwich,* 88 Conn. 241, 245, 90 Atl. 801; or, to state it in another way, to draw more precisely the line between property, which because of its devo-

tion to public use, ought to be exempt and that which ought not to be.

The plaintiff claims that its property is entitled to an exemption on the ground that it is a Connecticut corporation organized exclusively for educational or charitable purposes and that the Masonic Temple in part at least is used exclusively for carrying out such purposes. While, as we have said, upon the finding, it could hardly be denied that Masonry in theory and practice is educational in the broad sense of fostering the culture, developing the powers and forming the character of its members, the plaintiff does not claim that it is educational in the more restricted sense of affording systematic instruction and training for the young in preparation for the work of life. The history of the statute as applied to educational institutions makes it clear that it is the property of such organizations as serve the purposes of education in this more restricted sense which the legislature intended to exempt. The trial court has found that the plaintiff was not organized nor any part of its property used exclusively for charitable purposes. That the order teaches benevolence and charity, that the various lodges perform acts of charity, and that they contribute to the support of the Grand Lodge whose funds in turn are largely used to support the Masonic Charity Foundation is found. But what proportion of the funds of the lodges is used for charitable purposes, or to what extent they carry on charitable work is not found, nor does the evidence show; nor can it be found that charitable work is their predominant purpose. The fact that they are secret fraternal orders, the opportunity to join which is not found to depend to any extent upon the contributions, financial or otherwise, which a man would be likely to make to its charitable work, goes far to rebut the contention of the plaintiff. In

such an organization it is to be expected that social inclinations will be largely influential in causing an application to be made for membership; that social considerations on the part of members of the lodge will considerably determine its action in accepting such an application; and that social activities will have a definite part in its program; and nothing in the record indicates that this is not so as regards Masonic lodges. We cannot disturb the finding of the trial court that the lodges are not exclusively organized nor the Temple or any portion of it exclusively used for charitable purposes.

The plaintiff also claims that the Masonic Temple is exempt in whole or in part as a house of religious worship. Previous to 1929 the only exemption of the property of organizations religious in nature was that of "churches" and the buildings belonging to and used exclusively for ecclesiastical societies. These provisions evidently referred to buildings devoted to the practice of religious worship as it is customarily carried on in or in connection with the forms of such worship traditional in this State. Such churches ordinarily conduct services of worship open to all that care to attend. Their purposes are exclusively to further the worship of God and to carry out such activities as are the natural outgrowth of the teachings of religion. Membership in them is intended to be dependent solely upon the desire of the individual to associate himself with those who publicly profess their religious belief and who are seeking to conform their lives to its teachings. Social activities connected with them are designed to be entirely subordinate to these ends. The conception that, to be entitled to an exemption, a building devoted to religious uses should be a place of public worship is implicit in the theory of the exemption of

such buildings. "The principle that property necessary for the operation of State and municipal governments, and buildings occupied for those essential supports of government, public education and public worship, ought not to be the subject of taxation, has been with us accepted as axiomatic." *Yale University* v. *New Haven,* 71 Conn. 316, 332, 42 Atl. 87. See *Manresa Institute* v. *Norwalk,* 61 Conn. 228, 230, 23 Atl. 1088; *Pomfret School* v. *Pomfret,* 105 Conn. 456, 460, 136 Atl. 88; *Stamford Jewish Center, Inc.* v. *Stamford,* 117 Conn. 379, 385, 168 Atl. 5. An organization which meets in secret, membership in which is dependent in part at least on social considerations and the ends of which are in part at least of a social nature would not conform to these standards; *Connecticut Spiritualist Camp-Meeting Association* v. *East Lyme,* 54 Conn. 152, 155, 5 Atl. 849; *Manresa Institute* v. *Norwalk,* supra; *Huntington* v. *Swedish Baptist Home of Rest,* 90 Conn. 504, 97 Atl. 860; and so far as this record shows Masonic lodges fall within that class.

When in 1929 the word "churches" was dropped from the statute and "houses of religious worship" substituted, the legislature probably intended to avoid the suggestion that only those buildings exclusively used for churches, with the significance which that word undoubtedly had in the original provision for tax exemption and with the meaning which historically might be associated with it, should be exempt; but that it was intended to include the buildings of organizations not having those essential characteristics of churches to which we have referred is in no way indicated; indeed the use of the word "pews" in connection with the phrase in the present statute indicates the contrary. The similarity of the provision in the present statute to the ancient law of Massachusetts

giving an analogous exemption suggests that the language of our statute was taken from that of Massachusetts and makes pat the statement in *Evangelical Baptist B. & M. Society* v. *Boston,* 204 Mass. 28, 31, 90 N. E. 572: "The purpose of the provision was to exempt from taxation ordinary church edifices, owned and used in the usual way for religious worship." Masonic organizations certainly do not fall within that class of which historically it may be said that as to their property nontaxation has been not the exception but the rule; and that they have not been excepted from a rule in which they were never included. *Yale University* v. *New Haven,* supra, 329, 330. The change in the language of the statute could not be interpreted to include the property of such organizations unless the intention of the legislature to do so appeared more clearly than it does. *Jewett City Savings Bank* v. *Board of Equalization,* 116 Conn. 172, 185, 164 Atl. 643.

The able briefs of counsel have brought to our attention numerous decisions in other jurisdictions wherein the exemption of the property of Masonic organizations has been considered. Almost without exception, where it has been found to be exempt, it has been upon the ground that Masonic organizations are charitable or benevolent organizations, an issue which in this case is concluded by the finding. But, that aside, where these decisions are not dealing with institutions which, though controlled by the fraternity, are actually devoted to the relief of the needy, they are concerned with the interpretation of statutes for the most part broader in their terms than ours, or are dictated by an established legislative policy, or are decided under a principle of liberality in the construction of exemption laws foreign to our policy. They are therefore not of

material assistance in applying our law to the situation presented to us by the record in this case.

There is no error.

In this opinion the other judges concurred.